# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

**BRUNILDA RODRÍGUEZ-SOTO**

**Plaintiff,**

**v.**

**PRESBYTERIAN MEDICAL ANESTHESIA GROUP**

**Defendants.**

**CIVIL NO. 17-1477 (GAG)**

## OPINION AND ORDER

Brunilda Rodríguez-Soto ("Plaintiff") filed this action against Presbyterian Medial Anesthesia Group ("Defendants" or "PMAG") alleging violations under the Consolidated Omnibus Budget Reconciliation ("COBRA"). See 29 U.S.C. §§ 1161 et seq. Plaintiff claims that Defendants failed to notify her of her COBRA rights, in violation of said statute. (Docket No. 1). Before the Court is Defendants' Motion for Summary Judgment arguing that COBRA provides exceptions when an employee is dismissed for "gross misconduct." (Docket No. 25 at 1). Plaintiff counters in her Response to Defendants' Motion for Summary Judgment (Docket No. 36) that she was not terminated for gross misconduct and that PMAG was subject to the provisions found within COBRA. Id. For the reasons discussed below Defendants' Motion for Summary Judgment (Docket No. 25) is **GRANTED**.

**I.      Local Rule 56**

Local Rule 56 standard cited from Natal Perez v. Oriental Bank & Trust, 291 F. Supp 3d 215, 218-220 (D.P.R. 2018). The issue is whether Plaintiff properly denied and qualified Defendants statement of uncontested material facts when she included additional facts in her denials and qualifications. Although Defendants did not raise the issue, the Court addresses it *sua sponte*.

**Civil No. 17-1477 (GAG)**

At the summary judgment stage, parties must follow Local Rule 56. Section (c) instructs that "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts." L. Cv. R. 56(c). This opposing statement "shall admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Id. Each denial and qualification must be supported by a record citation. Id.

In addition to allowing an opposing party to admit, deny, or qualify the moving party's facts, Local Rule 56(c) allows an opposing party to submit additional facts "*in a separate section*." Id. (emphasis added). As the First Circuit has stated, "[t]he plain language of the rule specifically requires that additional facts be put forward in a 'separate section.'" Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 32 (1st Cir. 2010) (holding that district court acted within its discretion when it disregarded additional facts not contained in a separate section). A separate section serves two purposes: "to allow the moving party to reply to those additional facts and to allow the court to easily determine the disputed facts." Malave-Torres v. Cusido, 919 F. Supp. 2d 198, 207 (D.P.R. 2013). For these reasons, "a party may not include numerous additional facts within its opposition to the moving party's statements of uncontested facts." Id.

If a party improperly controverts the facts, Local Rule 56 allows the Court to treat the opposing party's facts as uncontroverted. Thus, the First Circuit has consistently held that litigants ignore Local Rule 56 at their peril. See Caban Hernandez v. Philip Morris USA, Inc., 486 F. 3d 1, 7 (1st Cir. 2007).

The line between a properly supported qualification or denial and additional facts can be blurry. Because Local Rule 56 requires that a record citation support each qualification or denial, it can seem inevitable to proffer additional facts when doing so. But a better understanding of what

constitutes a qualification or denial helps. A qualification is "[a] modification or limitation of terms or language; esp., a restriction of terms that would otherwise be interpreted broadly." *Qualification*, BLACK'S LAW DICTIONARY 1436 (10th ed 2014). Simply put, a qualification must clarify a statement of fact that, without clarification, could lead the Court to an incorrect inference. Thus, if a fact states that "Plaintiff works as an attorney all day," a proper qualification would be: "Plaintiff works as an attorney from 9-5" and a citation to the record supporting this fact. This would prevent the Court from inferring that Plaintiff works as an attorney from 7 a.m. to 9 p.m., which can be the standard in the legal world. Adding that Plaintiff works from 9-5 would not be considered an "additional fact" in the context of Local Rule 56. On the other hand, a denial, as common sense suggests, is "[a] statement that something is not true." *Denial*, id. at 527. So if a fact states that "Plaintiff is an attorney," a proper denial would be: "Denied. Plaintiff is a doctor" and a citation to the record supporting this fact.

First Circuit case law sheds some light on when parties cross the line between a proper qualification or denial and additional facts. In Acevedo-Padilla v. Novartis Ex Lax, Inc., the district court held that "a party's denial or qualification of a proposed fact *must be strictly limited to the issue therein raised.* Any additional information shall be included in a separate section in order to ease the Court's task." 740 F. Supp. 2d 293, 298 (D.P.R. 2010), rev'd and remanded on other grounds, 696 F.3d 128 (1st Cir. 2012) (emphasis added).[1] The First Circuit affirmed this ruling, labeling it "an appropriate exercise of [the district court's] discretion." Acevedo-Parrilla, 696 F.3d at 137 ("[D]istrict court, in an appropriate exercise of its discretion, ruled that it would disregard any additional facts provided by [plaintiff] when denying or qualifying [defendant's] statement of

---

[1] The district court's opinion, as published, mistakenly names the plaintiff "Acevedo-Padilla" instead of "Acevedo-Parrilla." The First Circuit corrected the mistake. The Court will refer to the cases as they appear published.

uncontested facts"). So, returning to the previous example of the 9-5 attorney, it could be improper to qualify the fact that Plaintiff works "all day" by adding that one day at work, Plaintiff's boss made a discriminatory remark. This fact would not be "strictly limited to the issue therein raised." Acevedo-Padilla, 740 F. Supp. 2d at 298.

The Court notes that the "strictly limited to the issue therein raised" standard for denials and qualifications, as articulated by my esteemed colleague, the late Senior Judge Salvador E. Casellas, is demanding but necessary. Id. The Court wants to impart justice, and lawyers play an essential role in helping it achieve this goal. Honest argumentation and clear presentation of the issues and facts help the Court tremendously. The opposite burdens the Court just as much.[2]

Here, Plaintiff's response to Defendants' statement of uncontested material facts suffers from the same flaw as the plaintiff's in Acevedo-Parrilla: almost all of Plaintiff's denials, qualifications, and admissions contain additional facts, which are later reiterated in a separate section. To illustrate the problem, here is a notable example:

> Because of the nature of the group practice, both anesthesiologists and anesthetist nurses manage and administer controlled substances, which are regulated by both state and federal laws. Therefore, PMAG has strict requirements and policies for the procurement, storage, dispensing, administration, and monitoring of controlled medication.

Docket No. 24 at ¶ 3 (Record citations omitted). A proper qualification would be limited. It may clarify that the rules are flexible and often not enforced, supported evidence demonstrating such. Instead, Plaintiff presents the Court with the following narration:

> Rodriguez admits the statement contained in the first sentence of paragraph 3 of the SUF. The statements contained in the second sentence of paragraph 3 is objected in part, denied in part and qualified in part. Certainly, PMAG has requirements and policies related to the controlled medicines, but the rules are not so detailed, neither cannot be characterized as "strict[.]" The only rules established by PMAG

---

[2] Local Rule 56 standard cited from Natal Perez v. Oriental Bank & Trust, 291 F. Supp 3d 215, -218-220 (D.P.R. 2018).

regarding narcotics are contained in Exhibit 4 attached to the SUF ("If a discrepancy in the count if found, that is if it is not complete, the anesthetist in charge [who] is ending his shift and the anesthetist [who] is starting his shift must resolve. You cannot leave an incomplete count.") ("Personnel who relieve at the moment of the relieve; takes charge the responsibility, which means that he is not exempted from registering the narcotic.") ("Avoid narcotic excess and consult the anesthesiologist about the balance[ ]; verify your narcotics between case and case and balance them-do not wait until 2pm to do it-; avoid crossing-out in the narcotics book because for this reason they can fine; the narcotic balance, it has to be clear and precise and there cannot be a lacking and/or omission in the administration of a narcotic since in a pharmacy inspection an audit is performed by what is administered and documented in the patient's file[,]") and (rules applicable to the moment in which an anesthetist is in charge of the narcotics at a particular shift). The other instruction related to controlled medicines, which was not in writing, was that unresolved inventories, irregular occurrence and variances in controlled medicines and narcotics have to be informed by the anesthetist in charge who is ending his shift to the supervisor or to the manager. This can be done by a telephone call to the supervisor or the manager that has to be done in front of the anesthetist who is starting his shift. The anesthetist who is starting his shift (not in charge) does not have to call the supervisor or to the manager, and has the option to accept the key of the unbalanced controlled medications box if the anesthesiologist in shift, the manager or the supervisor authorize it. The anesthesiologist has the authority to approve the acceptance of an unbalanced inventory because otherwise he would have no medication to provide to the patients during the shift. The anesthetist who is starting his shift (not in charge) has the option of not accepting the unbalance inventory even ordered to do so, but this would probably produce the closing of the surgery room during the shift. There is no rule establishing that disciplinary actions can be applied to an employee who violates any of these rules, neither establishing which disciplinary action is applicable. In the practice, an employee was disciplined due to mistakes related to controlled medications when it was a recurrent and repeated fault. The employee could be dismissed only when he was caught using the medication. Therefore, characterizing as "strict" the rules related to controlled medications is a self-serving declaration and an inadmissible and unsupported conclusory allegation. Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 313, 315 (1st Cir. 2016). The assertion does not have specific factual information and support, being inadmissible. Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc., 473 F.3d 11, 18 (1st Cir. 2007). Furthermore, it is contrary to the evidence because it is contradictory to say that there are strict rules when Defendant does not even have establish by writing disciplinary actions.

Docket No. 36-1 at 4-7 ¶ 3 (Record citations omitted). Plaintiff's response goes well beyond the issue therein raised. Another notable issue was Plaintiff's qualification of Paragraph No. 1, which states "PMAG is a group that specializes in anesthesiology. It operates out of the Presbyterian

**Civil No. 17-1477 (GAG)**

Hospital in San Juan, Puerto Rico." (Docket No. 24 ¶ 1) (Record citations omitted). Plaintiff responds as follows (Docket No. 36-1 at 4 ¶ 1):

> Plaintiff, Brunild Rodriguez ("[]Rodriguez") admits the statement contained in the first sentence of paragraph 1 of Defendant PMAG's Supporting Statement of Uncontested Facts ("SUF") and denies the statement contained in the second sentence of paragraph 1 of the SUF because Defendant operates **inside** the Presbyterian Hospital, no outside, being PMAG a subcontracted entity that provides anesthesiology services in the surgery rooms for the Presbyterian Hospital. PMAG' office near inside then hospital, near the surgery room of the hospital and PMAG does not provide anesthesiology services but to the Presbyterian Hospital.

Id. (Record citations omitted)(emphasis not added). Plaintiff's response goes well beyond the issue therein raised. Yet another notable issue was Plaintiff's qualification of Paragraph 1, which states "PMAG is a group that specializes in anesthesiology. It operates out of the Presbyterian Hospital in San Juan, Puerto Rico." (Docket No. 24 ¶ 1) (Record citations omitted).

> Plaintiff, Brunild Rodriguez ("[]Rodriguez") admits the statement contained in the first sentence of paragraph 1 of Defendant PMAG's Supporting Statement of Uncontested Facts ("SUF") and denies the statement contained in the second sentence of paragraph 1 of the SUF because Defendant operates **inside** the Presbyterian Hospital, no outside, being PMAG a subcontracted entity that provides anesthesiology services in the surgery rooms for the Presbyterian Hospital. PMAG' office near inside then hospital, near the surgery room of the hospital and PMAG does not provide anesthesiology services but to the Presbyterian Hospital.

(Docket No. 36-1 at 4)(internal citations omitted). Plaintiff fails to properly qualify or deny: Plaintiff's noncompliance is troubling to the Court for many of these improperly provided facts are crucial to her case and are extremely difficult to decipher. Furthermore, Plaintiff's responses at times are so off base and long winded that the Court was left wondering whether counsel is being paid by the word. As demonstrated above, many of Plaintiff's responses mischaracterize Defendants' statement of facts in a manner so baseless that the Court can only assume was intentional. More so, Plaintiff attacks multiple of Defendants facts for not having any "specific factual information and support, [thus] being inadmissible." (Docket 36-1 at 9, ¶ 8). Plaintiff posits such statements are unreliable and self-serving as their only support are sworn depositions by

**Civil No. 17-1477 (GAG)**

Defendants. Id.[3] However, the Court will not make judgments as to the veracity or reliability of sworn statements at the Summary Judgment stage. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court notes that those in glass houses should not toss stones. Twenty-two of Plaintiff's additional fifty-eight facts are exclusively supported by the Plaintiff's Declaration Under Penalty of Perjury, the very action they critique Defendants for. See Docket No. 36-1 at 10-53; Statement of Additional Facts ¶ 1, 2, 7, 19, 20, 21, 32, 33, 36, 37, 39, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, and 52.[4] Even more troubling is that Plaintiff's Declaration Under Penalty of Perjury is dated April 23, 2018, the very same date as her Counterstatement of Material Facts. (Docket Nos. 36-3; 36-1). Plaintiff's Declaration Under Penalty of Perjury is dated more than three months after discovery ended on January 1, 2018, and Defendants' filing for summary judgment. (Docket Nos. 19; 25). Thus, raising serious concerns under the sham affidavit rule.

**II. Plaintiff's Post Summary Judgment Declaration**

As a threshold matter, the first court addresses the admissibility of Plaintiff's Declaration Under Penalty of Perjury provided in support of her objections to Defendant's Statement of Uncontested Facts. (Docket Nos. 36-3; 24). Under the sham affidavit rule, following discovery a party may not use a later affidavit to contradict facts previously provided to survive summary judgment, unless the party provides a satisfactory explanation for providing post summary judgment affidavit. Morales v. AC Orssleff's EFTF, 246 F.3d 32, 35 (1st Cir. 2001). See also Reyes v.

---

[4] Plaintiff's counsel is once again admonished to comply with Local Rule 56 in the future. Failure to do so may be considered malpractice. Escribano-Reyes v. Prof'l Hepa Certificate Corp., 817 F.3d 380, 391 (1st Cir. 2016).

7

Professional HEPA Certification Corp., 74 F. Supp.3d 484, 490 (2015), *affirmed in* Escribano-Reyes v. Professional Hepa Certificate Corp., 817 F.3d 380 (2016).

Plaintiff's Declaration Under Penalty of Perjury, signed April 23, 2018. Discovery had ended on January 1, 2018, as of three months and Defendants' summary judgment has been filed a month prior on March 21, 2018. (Docket Nos. 19; 25). Plaintiff's Declaration Under Penalty of Perjury contains no explanation as to its tardiness and new factual contentions. (Docket No. 36-3). The Court is cautious as the declaration contains many new additional facts. The Court is cautious that the declarations sole purpose may be to create issues of fact with the intent to defeat summary judgement. See Escribano-Reyes, 817 F.3d 380.

As discussed above, twenty-two of Plaintiff's additional fifty-eight facts are exclusively supported by Plaintiff's post summary judgment declaration. Similar actions have been rebuked be this Court.

> This exercise, in and of itself, constitutes an otherwise considerable and unwarranted task for the court to perform prior to even passing upon the merits of the summary judgment motion. It is probably even more complicated a task that ruling on the summary judgment motion. But at a threshold level, the plaintiff has not even offered an explanation for why his affidavit was presented after the fact of filing the summary judgment motion.

Reyes v. Professional HEPA Certification Corp., 74 F. Supp.3d at 492 (citing Velázquez-Pérez v. Developers Diversified Realty, Civil No. 10-1002, Docket No. 131).

In determining whether the testimony constitutes an attempt to manufacture an issue of fact so as to defeat summary judgment, the court may consider the timing of the affidavit, as well as the party's explanation for the discrepancies. See Orta–Castro v. Merck, Sharp & Dohme Química P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006) (affirming the district court's decision to disregard later filed affidavit that contradicted prior deposition testimony). See also Escribano-Reyes, 817 F.3d at 387.

**Civil No. 17-1477 (GAG)**

Such testimony can be stricken by the court when the party proffering the evidence provides no satisfactory explanation for the changed testimony. See Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 20–21 (1st Cir. 2000) (citing Colantuoni, 44 F.3d at 4–5). A review of the declaration in question and the record evidence reveals that Plaintiff's post summary judgment declaration contains new facts that are not contained in the rest of the evidence of record. Notably, the timing of the affidavit, signed by Plaintiff the day before the filing of her opposition, by itself, raises serious concerns as to its validity and authenticity. In both Colantuoni, 44 F.3d at 5, and Torres, 219 F.3d at 13, the First Circuit found similar chronology to the case at hand to be "probative of the fact that the non-movant was merely attempting to create an issue of fact." Orta–Castro, 447 F.3d at 110. Moreover, as in Torres, 219 F.3d at 13, the lack of explanation as to why Plaintiff's sworn statement came to life post summary judgment pushes this sworn statement off the table. Reyes v. Professional HEPA Certification Corp., 74 F. Supp.3d at 492-493.

Accordingly, pursuant to the sham affidavit doctrine, the court strikes Plaintiff's Declaration Under Penalty of Perjury (Docket No. 36-3) from the record. Plaintiff's pleadings supported by the stricken evidence will be deemed unsupported, pursuant to by Rule 56 of the Federal Rules of Civil Procedure.

### III. Relevant Factual Background

The uncontested relevant facts are as follows. PMAG is a group practice that administers their services at the Presbyterian Hospital in San Juan, Puerto Rico. (Docket Nos. 24 at ¶ 1; 36-1 at 4 ¶ 1). The group specializes in anesthesiology. Id. Zulma Acevedo ("Acevedo") is PMAG's General manager of Clinical Services of Anesthesiology. (Docket Nos. 24 at ¶ 23; 36-1 at 16 ¶ 23).

**Civil No. 17-1477 (GAG)**

Acevedo's duties include supervision for compliance with narcotic and controlled substances requirements. Id.

Plaintiff, began working as a fulltime anesthetist nurse for PMAG in 2008. (Docket Nos. 24-2 at 151; 36-1 at 12 ¶ 12). Plaintiff had previously worked with PMAG part time. Id. [5] In her role as an anesthetist nurse, Plaintiff interacted with anesthesiologists, surgeons, as well as other physicians to deliver anesthesia. (Docket Nos. 24 at ¶ 14; 36-1 at 13 ¶ 14). As part of her duties, Plaintiff performed and documented pre-anesthetic assessments, evaluated patients, as well as selection and administration of anesthetics and liquids necessary to manage said anesthetic. (Docket Nos. 24 at ¶ 15; 36-1 at 13 ¶ 15). Plaintiff "was informed of the policies," (Docket No. 36-1 at 14 ¶ 17) and PMAG's norms for handling controlled medications. (Docket Nos. 24 at ¶ 20; 36-1 at 15 ¶ 20).

The management and administration of controlled substances by both anesthesiologists and anesthetist nurses are regulated by federal and state statues. (Docket Nos. 24 at ¶ 3; 36-1 at 4 ¶ 3). PMAG has additional security and occupational health policies and guidelines found within their Employee Manual to ensure "high productivity, efficiency[,] and loss prevention." (Docket Nos. 24 at ¶ 4; 36-1 at 7 ¶ 4). Every employee, when hired, is required to familiarize themselves with the Employee Manual and sign a certification confirming they understand PMAG's rules and procedures. (Docket Nos. 24 at ¶ 5; 36-1 at 7 ¶ 5). The Employee Manual requires that employees "comply with internal safety regulations." (Docket Nos. 24 at ¶ 6; 36-1 at 7 ¶ 6). PMAG had additional policies, not found within the Employee Manual, regarding controlled substances and unresolved inventories. (Docket Nos. 24 at ¶ 3; 36-1 at 5 ¶ 3). One such policy requires that any

---

[5] Defendant qualifies that she worked for PMAG for intermittent periods between 1994 to 2008 as a part time employee. (Docket Nos. 24-2 at 151-; 36-1 at 12-13 ¶ 12-13)

**Civil No. 17-1477 (GAG)**

"unresolved inventory, irregular occurrence or record variances concerning narcotics must be immediately informed" (Docket No. 24 ¶ 7) to a supervisor or manager. (Id.; 36-1 at 8 ¶ 7).

There is a standardized documentation process, which requires that anesthetist nurses record all medication given to patients in the Register for the Administration of Controlled Substances. (Docket Nos. 24 at ¶ 18; 36-1 at 15 ¶ 18). Employees must count and verify the narcotic count with the written register ensuring it mirrors the current controlled substances. (Docket Nos. 24 at ¶ 19; 36-1 at 15 ¶ 19). When there is a "discrepancy in the count . . . the anesthetist in charge who is ending [their] shift *and* the anesthetist who is starting [their] shift [m]ust resolve it."[6] (emphasis added) (Urgent Communication dated March 27, 2008, Docket No. 24-4 at 2). The count cannot be left incomplete. Id. Acevedo is to be informed of any issues pertaining to unresolved inventory. (Docket Nos. 24 at ¶ 24; 36-1 at 16 ¶ 24). Failure to adhere to the established procedures and incorrect handling of controlled medication by a PMAG employee jeopardizes the group's license and may subject the group to economic sanctions. (Docket Nos. 24 at ¶ 10; 36-1 at 11 ¶ 10). PMAG held at minimum two meetings, which Plaintiff attended, discussing the policies regarding employee and patient safety, in addition to management of controlled substances. (Docket Nos. 24 at ¶ 11, 29, 30; 24-4 at 3; 24-15 at 1; 36-1 at 12 ¶ 11, at 19 ¶ 29, 30).

On November 17, 2016, there was an incident pertaining to a discrepancy between the controlled medication count and the count written in the register. (Docket Nos. 24 at ¶ 27; 36-1 at 18 ¶ 27). Plaintiff and Defendants have considerable disagreements regarding the facts surrounding

---

[6] Plaintiff expressed concern regarding the translation of the term "tienen que resolver" to "must resolve." Though they do not file a certified translation themselves, Plaintiff contests that the correct translation is "find a solution." (Docket No. 36-1 at 18 ¶ 26). The Court notes Plaintiff's concern, however, "find a solution" is the dictionary definition of the verb resolve. See *Resolve*, Oxford Dictionary (2019)

11

**Civil No. 17-1477 (GAG)**

this incident. However, both parties agree that on the day in question Plaintiff entered the hospital to begin her 11pm-7am shift. (Docket Nos. 24 at ¶ 31; 36-1 at 19 ¶ 31). Upon arriving Plaintiff discovered fellow co-worker Arnaldo Hernández ("Hernández"), who was flustered as he couldn't decipher why there was a discrepancy between the controlled medication count and the count written in the register. Id. Neither Plaintiff nor Hernández count decipher the origin or cause of the irregularity. (Docket Nos. 24 at ¶ 32; 36-1 at 19 ¶ 32).

This is where the narrative gets complicated. Hernández left prior to reconciling the counts. Plaintiff claims Hernández left as "his wife got nervous when he did not arrive home on time." (Docket Nos. 24 at ¶ 33; 36-1 at 20 ¶ 33). Defendants, on the other hand, claim Plaintiff assured Hernández that she would continue to search for the error. Id. From this point on both Plaintiff and Defendants motions turn into a "he said, she said" conundrum. (Docket Nos. 24 at ¶ 34-60; 36-1 at 21 ¶ 34-60). When Hernández left he handed over the key to the narcotics to Plaintiff. (Docket Nos. 24 at ¶ 34; 36-1 at 21 ¶ 34). Plaintiff denies the following alleged events and makes several objections as to their admissibility.[7] (Docket No 36-1).

Upon receiving the key Plaintiff signed a slip "certifying the medication count." As Plaintiff was managing the inventory[,] fellow employee, Alan Torres informed Plaintiff that he had to register a vail of Versed, which he had administered to a patient. (Docket No 24, ¶ 37) Plaintiff requested the patient's label and assured Torres that she would register the medication once the immediate situation was resolved. Id. Upon completing her shift, Plaintiff furnished Mariel Quiñones, fellow anesthetist nurse, with the narcotics key and proceeded to leave without

---

[7] Plaintiff makes several hearsay objections to Defendants statements. (Docket No. 36-1). In relation to this contested alleged version of facts the Court will not address such objections at this point in time as it recognizes Plaintiff's improper pleadings led to the strike of her declaration. Thus, she has not properly contested twenty-two facts. It would only burden the Court to delve into such an analysis that is not outcome determinative under these circumstances.

12

**Civil No. 17-1477 (GAG)**

notifying Quiñones as to the incident, nor filing an incident report. Id. at ¶ 38-39. Plaintiff failed to report the incident to the appropriate supervisors. Acevedo did not come to know of the incident till the next day. Id. at ¶ 39. Acevedo was told by Hernández that he had omitted to register the Versed. Id.

Acevedo called Plaintiff to further inquire as to the previous day's occurrence, Plaintiff had the speakerphone on in front of third parties, and denied any imbalance as to the controlled medications and stated that others were the cause of any discrepancy. Id. at ¶ 40. Later when Plaintiff returned to the hospital, in the presence of Plaintiff's mother, Acevedo and Plaintiff discussed that the incident was currently under investigation, and that both herself and Torres violated PMAG's protocol when they left their shifts without resolving the inventory. Id. at ¶ 41-42. Acevedo reaffirmed that Plaintiff was to provide an incident report in order to complete the required investigation. Id. at ¶ 43. Plaintiff claimed that as she made no error no report need be rendered. Id. at ¶ 44.

On November 22, 2016, the licenced pharmacist in charge of the Pharmacy Department made a request for the book containing all narcotics incidents as Plaintiff had rendered a report regarding the controlled medication incident.[8] (Docket Nos. 24, ¶ 45; 36-1, ¶ 45). Plaintiff was in violation of established protocol by not first informing said incident to the manager, whom then notifies the Pharmacy Department. (Docket Nos. 24, ¶ 46). Plaintiff was subsequently chastised by Acevedo for violating establish protocol. (Docket Nos. 24, ¶ 47). Plaintiff responded to

---

[8] Plaintiff admits this one fact but continues to deny Defendants' assertions found within this same paragraph. (Docket No. 36-1, ¶ 45)

13

**Civil No. 17-1477 (GAG)**

Acevedo's investigation into the event with insubordination and blame shifting. (Docket Nos. 24, ¶ 49).

Plaintiff was later terminated on Novemeber 23, 2016, for "violation of written rules of conduct, mishandling of controlled substances, and speaking about confidential hospital and PMAG issues in the presence of third parties," thus constituting severe violations of company policy. (Docket No. 24, ¶ 50-51). The Court again finds it important to note that Plaintiff denies the Defendants' sequence of events.

Plaintiff counters Defendants' version of events through her post summary judgment declaration under penalty of perjury. She asserts that Hernández left without balancing the narcotics count. (Docket No. 36-1 at 22, ¶ 36). She accepted the key knowing the count was off but accepted the key so that procedures may continue as scheduled. Id. Plaintiff claims she never spoke with Torres, nor did she take the patient's label and assure Torres she would register such. Id. ¶ 37. Plaintiff continues to systematically deny Defendants events. Id. ¶ 37-50. Both Plaintiff and Defendants rely on sworn statements to substantiate their allegations.

IV.     **Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the Court finds that a genuine issue of material fact remains, the resolution of which could affect the outcome of the case, then the Court must deny summary judgment. See Anderson, 477 U.S. at 248.

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the Court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the nonmoving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

**V.     Legal Analysis**

The Consolidated Omnibus Budget Reconciliation Act ("COBRA") 29 U.S.C. § 1161 et seq., mandates that employers give employees an "opportunity to continue their health coverage for a specified period of time after a 'qualifying event,' at the employee's expense." Torres-Negron v. Merck & Co., 488 F.3d 34, 45 (1st Cir. 2007); see 29 U.S.C. § 1161(a). Such as termination of employment. Id. Employers are to provide a second notice to health plan administrators as to the termination within 30 days of said qualifying event. Id. Plan administrators are then given a

**Civil No. 17-1477 (GAG)**

subsequent 14 days to notify the qualified beneficiary of their right to continue coverage. Id. While COBRA does not require notification by a particular means an employer must make a good faith attempt to comply. Torres-Negron v. Merck & Co., 488 F.3d at 45. Under a COBRA plan the employee can continue their health and life insurance coverage if they are willing to assume the payments. Mercado-Garcia v. Ponce Fed. Bank, 979 F.2d 890, 892 (1st Cir. 1992). A plan has 60 days from notification to elect to continue insurance coverage. Id. Plan participants who are not provided such information have a cause of action "against plan administrators who fail to comply with a request to provide any such information." Berrios-Cintron v. Capitol Food, Inc., 497 F. Supp. 2d 266, 267 (D.P.R. 2007).

While COBRA provides a statutory penalty, courts are reluctant to impose such penalties without a showing of bad faith and prejudice to the plaintiff. Id. "If the plan participant cannot show that he was adversely affected in some significant fashion, the discretionary penalty allowed by the statute is often not imposed." Id.

> The First Circuit Court of Appeals has accepted that courts may, in the exercise of their discretion on this matter, grant dispositive weight to these considerations. Kerkhof, 282 F.3d at 55-56 (rejecting argument that it was error for district court to require a showing of bad faith or prejudice and affirming decision not to impose penalties pursuant to § 1132(c)(1) in the absence of a showing of either harm to the plaintiff or bad faith on the part of the plan administrator); see also Rodríguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 588-89 (1st Cir. 1993) (finding that the district court did not abuse its discretion by declining to impose penalties against the plan administrator in the absence of evidence of bad faith or harm to plaintiffs). Generally, "[i]f the plan participant cannot show that he/she had been adversely affected in some *significant* fashion, the discretionary penalty allowed by the statute is rarely imposed." González Villanueva, 339 F.Supp.2d at 359 (emphasis added and citations omitted); Berrios-Cintrón v. Capitol Food, Inc., 497 F.Supp.2d 266, 271 (D.P.R. 2007) (citing Rodríguez-Abreu, 986 F.2d at 588-89 and Kerkhof, 282 F.3d at 56); see also Gómez v. St. Vincent Health, Inc., 649 F.3d 583, 590-91 (7th Cir. 2011), as modified (Sept. 22, 2011) (affirming district court's decision to decline to award statutory penalties where plan participants were not "significantly prejudiced by the delay in notification."); Jordan v. Tyson Foods,

**Civil No. 17-1477 (GAG)**

Inc., 312 F. App'x 726, 736 (6th Cir. 2008) (affirming district court's decision to decline to award statutory penalties where counsel for the plan participant "was not able to articulate any appreciable harm" from the failure to provide notice). Rivera v. Unión de Tronquistas de P.R. Local 901, No. 13-1949 (MEL), 2016 U.S. Dist. LEXIS 86339, at *7 (D.P.R. July 1, 2016). The penalty provision expressly leaves it "in the court's discretion" to determine whether penalties are appropriate for a failure to disclose. 29 U.S.C. § 1132(c)(1). Kerkhof v. MCI Worldcom Inc., 282 F.3d 44, 55 (1st Cir. 2002). "Termination of employment on account of the employee's gross misconduct relieves the employer of the statutory obligation to provide COBRA notice and continuing coverage." Morales Cotte v. Coop. de Ahorro y Credito Yabucoena, 77 F. Supp. 2d 237, 238 (D.P.R. 1999); See also 29 U.S.C. § 1163(2).

A.  Gross Misconduct Exception

Defendants concede that they failed to provide Plaintiff with adequate notification at the commencement of Plaintiff participation in the group plan. (Docket No. 25 at 6). Additionally, they acknowledge that they failed to furnish Plaintiff with a post termination notice, as required under COBRA. Id. at 7. However, Defendants allege Plaintiff was terminated for gross misconduct, and thus, is subject to COBRA's gross misconduct exception. Id. at 7-9. Section 1163(2) provides exception from the notice requirement upon termination when termination was due to gross misconduct. See 29 U.S.C. § 1163(2). Plaintiff strongly contest such. (Docket No. 37).

Plaintiff begins by contesting that even in the instance in which her discharge "was caused by violation to the rules that led to a loss of trust to retain a position. This would not constitute gross misconduct." (Docket No 37 at 15 (internal citations omitted)). The Court is not necessarily convinced that had Plaintiff acted in accordance as Defendants allege that her conduct would not constitute gross misconduct. However, the Court's primary contention at this point in time is not

17

whether Plaintiff's actions constituted gross misconduct, but as to what even happened. As such, there is an issue of material fact as to whether there was gross misconduct committed by Plaintiff.

Plaintiff pointblank denies many of Defendants crucial facts pertaining to the alleged gross misconduct. Plaintiff denies that she ever told fellow co-worker Hernandez to leave and "go rest." (Docket No. 36-1 at 20, ¶ 33). Additionally, Plaintiff claims that she only received the key to the narcotic box once the anesthesiologist approved so, and after Hernández made his intention to leave known. (Docket No. 36-1 at 21, ¶ 35). Plaintiff also claims that her declaration under penalty of perjury was mischaracterized and that her statements of "admission," as Defendants classify them, are nothing of the sort. Defendants claim that "Plaintiff admitted her violation of PMAG rules in the report addressed to the Pharmacy Department in which she states, "[m]y error was taking the keys.'" (Docket No 24, ¶ 36). Plaintiff counters that this was not an admission of rules violation, and that the rules did not require her to not accept the key under such conditions. (Docket No. 36-1 at 21, ¶ 36). Plaintiff denies any conversation occurred with Torres regarding the medication he failed to register. (Docket No. 36-1 at 22-23, ¶ 37). She also denied taking the patient's label and assuring him that she would complete the registration. Id. Crucially, Plaintiff alleges that Quiñones received and affirmed the narcotic count (Docket No. 36-1 at 23, ¶ 38). In direct contrast to Defendants allegations, Plaintiff claims to have called Acevedo that very night to report the incident over the phone. (Docket No. 36-1 at 23, ¶ 39). The Court could continue to address the discrepancies between both alleged version of events, however it feels the point has effectively been made. While it may appear that there are issues as to the material facts of this

**Civil No. 17-1477 (GAG)**

case, unfortunately for Plaintiff many of such stem from her stricken post summary judgment declaration and improperly contested facts.

While Defendants do acknowledge they failed to notify Plaintiff in accordance with COBRA, said obligations are not present when termination was a result of misconduct. Morales Cotte, 77 F. Supp. 2d at 238. Plaintiff has failed to properly contest and deny such allegations of gross misconduct with support. Plaintiff's bald denials, unsupported by evidence, are insufficient and do not place a reasonable jury in a position to decide that Defendant in fact terminated Plaintiff for a reason other than good cause.

### VI. Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment. (Docket No. 25) is **GRANTED**.

**SO ORDERED.**

In San Juan, Puerto Rico this 22nd day of March, 2019.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge